U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET




**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed March 21, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PLACID OIL COMPANY, | § | Case No. 86-33419-SGJ-11 |
| Debtor. | § | |
| PLACID OIL COMPANY, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 09-03356-SGJ |
| | § | |
| JIMMY WILLIAMS, SR., JIMMY | § | |
| WILLIAMS, JR., DALTON GLEN | § | |
| WILLIAMS, JEANETTE WILLIAMS | § | |
| SHOWS, & GWENDOLYN WILLIAMS | § | |
| PEACOCK, Individually and on | § | |
| behalf of the deceased, MYRA | § | |
| WILLIAMS, | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER: (1) GRANTING MOTION FOR SUMMARY
JUDGMENT OF REORGANIZED DEBTOR PLACID OIL COMPANY [DE # 26];
AND (2) DENYING MOTION FOR SUMMARY JUDGMENT OF
POST-CONFIRMATION TORT CLAIMANTS [DE # 29]

Before this court are cross motions for summary judgment,

responses, and supporting documentary evidence in the above-

1

referenced adversary proceeding (the "Adversary Proceeding").[1]

This Adversary Proceeding was filed by Placid Oil Company ("Placid" or "Reorganized Debtor"), approximately two decades after confirmation of a Chapter 11 plan and closure of its bankruptcy case, in order to determine whether certain tort claims that have been asserted in state court post-confirmation by Jimmy Williams, Sr., Jimmy Williams, Jr., Dalton Glen Williams, Jeanette Williams Shows, and Gwendolyn Williams Peacock, individually and on behalf of the deceased, Myra Williams (collectively, the "Post-Confirmation Tort Claimants," "Williams Defendants," or "Defendants"), were discharged by the

---

[1] Specifically, the court refers to: (1) Placid Oil Company's Motion for Summary Judgment and Brief in Support That Defendants' Claims Against Placid Oil Company Were Discharged in the Chapter 11 Case and are Forever Barred along with Exhibits A-O [DE ## 26, 27 & 28] (collectively, "Placid's MSJ"); (2) the Williams Defendants' Response and Brief in Opposition to Placid Oil Company's Motion for Summary Judgment [DE ## 36 & 37]; (3) the Williams Defendants' Motion for Summary Judgment and Brief in Support along with Exhibits 1, 1-A, 1-B, 1-C, 1-D, 1-E, and 1-F [DE ## 29, 30 & 31] (collectively, the "Post-Confirmation Tort Claimants' MSJ"); (4) Placid Oil Company's Response and Brief in Opposition to Defendants' Motion for Summary Judgment along with Exhibits A, B, B-1, B-2, C, C-1, C-2, C-3, C-4, C-5, C-6, C-7, C-8, C-9, C-10, C-11, C-12, C-13, C-14, C-15, C-16, C-17, C-18, C-19, C-20, C-21, C-22, C-23, C-24, C-25, C-26, C-27, and C-28 ("Placid's Response") [DE ## 33, 34 & 35]; and (5) Notice of New Case Law Authority [DE # 40]. At the hearing held on the cross motions for summary judgment, the court orally granted Placid Oil Company's Motion to Strike Defendants' Untimely Reply and Brief in Support [DE # 50], which related to the Williams Defendants' Reply to Placid Oil Company's Response and Brief in Opposition to Defendants' Motion for Summary Judgment [DE ## 48 & 49] (collectively, "Defendants' Reply"). Accordingly, the court did not consider the Defendants' Reply in reaching its ruling contained herein.

2

Confirmation Order in Placid's chapter 11 case. For the reasons set forth below: (1) Placid's MSJ is **_granted_**; and (2) the Post-Confirmation Tort Claimants' MSJ is **_denied_**. This Memorandum Opinion and Order is issued pursuant to Federal Rule of Bankruptcy Procedure 7056.

## I. UNDISPUTED MATERIAL FACTS[2]

A. *The Placid Bankruptcy Case*

Placid is an oil and gas company that was, at least at the time of its bankruptcy filing, headquartered in Dallas, Texas. In connection with its business, Placid formerly owned and operated a large natural gas field and processing facility in Black Lake, Natchitoches Parish, Louisiana (the "Black Lake Facility").

In the mid-1980s, the price of oil dropped precipitously, and Placid was unable to continue paying its debts. In order to prevent a threatened foreclosure, Placid commenced the above-entitled and numbered bankruptcy case (the "Bankruptcy Case"). On November 19, 1986, the court entered an Order Setting Bar Date [DE # 1184 in the Bankruptcy Case], which set January 31, 1987 as

---

[2] The majority of the facts in this Adversary Proceeding are agreed by the parties to be undisputed, as set forth in Placid's Exhibit A and the Defendants' Exhibit 1-F, which are identical copies of an Agreement of Counsel Regarding Assumed Facts for Adversary Proceeding 09-3356. The remaining summary judgment evidence will be referred to as "Placid's Exhibit __" [*see* DE # 28], "Defendants' Exhibit __" [*see* DE # 30], or "Placid's Response Exhibit __" [*see* DE # 35].

3

the bar date for potential creditors to file claims.[3]  On three occasions (*i.e.,* on January 2, 1987, January 9, 1987, and January 16, 1987), a Notice of Bar Date was published in the *Wall Street Journal*, a newspaper of national circulation that was available in Louisiana.[4]

During the course of the Bankruptcy Case (specifically, in June 1988), Placid sold the Black Lake Facility to NERCO Oil and Gas, Inc., pursuant to a Bankruptcy Code section 363 sale order, in order to eventually fund a plan of reorganization.[5]  Three months later, on September 30, 1988, Placid confirmed its Fourth Amended Plan of Reorganization (the "Plan").  The Order confirming the Debtor's Plan (the "Confirmation Order") provided that all claims against Placid that arose on or before September 30, 1988 (*i.e.,* the confirmation date), were forever discharged except for the Reorganized Debtor's obligations under the Plan (the "Discharge").[6]  The Confirmation Order also prohibited claimants from pursuing the Reorganized Debtor to enforce any claims that fell within the scope of the Discharge (the "Discharge Injunction").[7]  It has been agreed, for purposes of

---

[3] *See* Placid's Exhibit D.

[4] *See* Placid's Exhibits E, F & G.

[5] *See* Placid's Exhibit K.

[6] *See* Placid's Exhibit L, paragraph 2.

[7] *See* Placid's Exhibit L, paragraph 5.

4

this Adversary Proceeding that, pre-confirmation, Placid had no knowledge, one way or another, whether it would be subject to potential future personal injury claims related to asbestos exposure.[8]

B.    *The Claims of the Post-Confirmation Tort Claimants*

The Post-Confirmation Tort Claimants are the surviving widower (age 69) and four adult offspring (in their 30's and 40's) of Mrs. Myra Williams ("Mrs. Williams").  The Post-Confirmation Tort Claimants allege that they have suffered damages due to the death of Mrs. Williams, on August 9, 2003, allegedly caused by Mrs. Williams' exposure to asbestos dust and fibers when she handled and laundered the allegedly asbestos-laden clothing of her husband, Jimmy Williams, Sr. ("Mr. Williams").  Mr. Williams was employed at the Black Lake Facility, first by Placid, between 1966 and 1988, and then by NERCO and other subsequent owners of the Black Lake Facility, from 1988 to 1995.  Thus, Mr. Williams worked at the Black Lake Facility for almost 30 years (1966-1995).  In the course of performing his work, the parties agree that Mr. Williams was occupationally exposed to large quantities of asbestos-containing insulation products that were utilized and/or handled by, or in the close proximity of, Mr. Williams.[9]  Mr. Williams' initial job

---

[8] *See* Placid's Exhibit A, paragraph 13.

[9] *See* Placid's Exhibit A, paragraph 2.

for Placid was a switcher.[10] When he was a switcher, he worked with steam coils on certain flow lines and each of them was covered with insulation containing asbestos.[11] Also, certain heaters within the work area had insulation in them.[12] Mr. Williams later became a compressor operator and then a chief operator.[13] When he was a compressor operator, he worked with turbochargers, engines, and compressors that had insulation on them.[14] Mr. Williams later became a member of a maintenance crew (fixing anything that broke throughout the plant).[15] Mr. Williams also stated that he believes that he was exposed to asbestos at the Black Lake Facility through certain pipe insulation—specifically "hot oil piping" used in the process of "drying" natural gas—*i.e.,* getting propanes and pentanes out of the hydrocarbon gas (Mr. Williams testified that pipes carrying

---

[10] *See* Placid's Response Exhibit A, p. 27 of the Deposition Testimony.

[11] *See* Placid's Response Exhibit A, pp. 28-29 of the Deposition Testimony.

[12] *See* Placid's Response Exhibit A, p. 29 of the Deposition Testimony.

[13] *See* Defendants' Exhibit 1-E, p. 32 of the Deposition Testimony.

[14] *See* Defendants' Exhibit 1-E, p. 33 of the Deposition Testimony. *See also* Placid's Response Exhibit A, pp. 32-33 of the Deposition Testimony.

[15] *See* Defendants' Exhibit 1-E, p. 42 of the Deposition Testimony.

the hot oil had pipe insulation around them and this pipe insulation contained asbestos).[16] Mr. Williams believes, in particular, that he may have been exposed to asbestos dust in the compressor building at the Black Lake Facility where, once a year or so, he would have to pull out, repair, or rip off pipe insulation.[17] In summary, Mr. Williams occasionally handled or was near items with insulation containing asbestos.

It is agreed, for purposes of this Adversary Proceeding, that upon completion of Mr. Williams' daily work, he would leave the worksite and return home with asbestos dust and fibers on his clothing and person.[18] It is further agreed, for purposes of this Adversary Proceeding, that Mrs. Williams was then exposed to the asbestos dust and fibers when she gathered, handled, and laundered Mr. Williams' dust-laden clothing and ultimately sustained a very serious injury to her body.[19]

In 2003, Mrs. Williams suddenly developed pain and trouble breathing.[20] Shortly thereafter, Mrs. Williams was diagnosed

---

[16] *See* Defendants' Exhibit 1-E, pp. 25-27 of the Deposition Testimony.

[17] *See* Defendants' Exhibit 1-E, p. 33 of the Deposition Testimony.

[18] *See* Placid's Exhibit A, paragraph 2.

[19] See Placid's Exhibit A, paragraphs 3 and 4.

[20] *See* Placid's Exhibit A, paragraph 6.

7

with the asbestos-related lung cancer known as mesothelioma.[21] Mrs. Williams' contraction of mesothelioma resulted in immediate disability, physical pain and suffering, and severe mental stress, and she soon passed away, on August 9, 2003.[22]

On March 15, 2004, the Post-Confirmation Tort Claimants filed their Petition for Survival and Wrongful Death Damages in the Tenth Judicial District of the Parish of Nachitoches, State of Louisiana, which has since been amended by the First Supplemental and Amending Petition, the Second Supplemental and Amending Petition, and the Third Supplemental and Amending Petition (collectively, the "State Court Petition").[23]  The State Court Petition seeks compensation for personal injury under the survival statute, and for the alleged wrongful death of Mrs. Williams.[24]

---

[21] *See* Placid's Exhibit A, paragraph 5.

[22] *See* Placid's Exhibit A, paragraph 7.

[23] *See* Defendants' Exhibit 1-D.  The original state court petition was amended to add new defendants as they became known.

[24] Note that the asbestos-containing insulation products that Mr. Williams was allegedly exposed to were actually manufactured, distributed, marketed, or sold by various ***other***, unrelated defendants who have also been sued by the Post-Confirmation Tort Claimants.  In other words, Placid is one of but many unrelated parties that have been sued by the Post-Confirmation Tort Claimants.

C.    *Placid's Motion to Reopen the Chapter 11 Case and the Filing of the Adversary Proceeding*

On November 19, 2008, Placid[25] filed its Motion to Reopen Chapter 11 Case to Determine that Certain Pre-Petition Claims Were Discharged and to Enforce the Discharge Injunction [DE # 4625 in the Bankruptcy Case].  On January 22, 2009, the court granted Placid's motion, reopening the Bankruptcy Case for the limited purpose of determining whether certain claims being asserted against Placid, including those articulated in the State Court Petition, came within the scope of the Discharge and Discharge Injunction [DE # 4643 in the Bankruptcy Case].

On September 30, 2009, Placid filed its Complaint to Determine the Defendants' Claims Were Discharged and to Enforce Discharge Injunction [DE # 1], thereby commencing the Adversary Proceeding.  As earlier mentioned, for purposes of this Adversary Proceeding, Placid does not dispute that Mrs. Williams was exposed through her husband's asbestos-laden clothes to asbestos dust and fibers while her husband, Mr. Williams, was employed by Placid, at the Black Lake Facility.[26]  Moreover, Placid acknowledges that the asbestos-containing insulation products that caused this exposure were in the care, custody, and control

---

[25] Placid is now a subsidiary of Occidental Petroleum Corporation and remains an active corporation that owns oil and gas interests.  *See* Defendants' Exhibit 1-C, p. 6, paragraph 14.

[26] *See* Placid's Exhibit A, paragraph 8.

of Placid up through June 1988 when it sold the Black Lake Facility.[27]  Additionally, to the best of Placid's knowledge, the State Court Petition is the only asbestos-related personal injury claim that has ever been asserted against it.[28]  Moreover, unlike Mrs. Williams, none of the Post-Confirmation Tort Claimants has ever developed any asbestos-related illness and are currently all healthy.[29]  Additionally, to Mr. Williams' knowledge, none of his co-workers at the Black Lake Facility,[30] nor any of their spouses, has ever developed an asbestos-related illness.[31] Finally, Mr. Williams has testified that he was generally aware of Placid's Bankruptcy Case but does not recall employee meetings or updates or reading anything in the newspaper regarding the Bankruptcy Case.[32]

## II. JURISDICTION

This court has jurisdiction over this Adversary Proceeding

---

[27] *See* Placid's Exhibit A, paragraph 2.

[28] *See* Placid's Exhibit A, paragraph 12.

[29] *See* Placid's Exhibit A, paragraph 9.

[30] Mr. Williams testified that there were 65-70 employees at the Black Lake Facility when Placid sold it to NERCO in 1980 (and all Placid employees became NERCO employees).  *See* Defendants' Exhibit 1-E, p. 49 of the Deposition Testimony.

[31] *See* Placid's Exhibit A, paragraph 10.

[32] *See* Defendants' Exhibit 1-E, pp. 51 & 53 of the Deposition Testimony.

pursuant to 28 U.S.C. § 1334(b).[33]  This is a core proceeding
under 28 U.S.C. § 157(b)(2)(I).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate whenever a movant
establishes that the pleadings, affidavits, and other evidence
available to the court demonstrate that no genuine issue of
material fact exists, and the movant is, thus, entitled to
judgment as a matter of law.  FED. R. CIV. P. 56(a); *Piazza's
Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006*);
Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D.
Tex. 2004).  A genuine issue of material fact is present when the
evidence is such that a reasonable fact finder could return a
verdict for the non-movant.  *Piazza's Seafood World, LLC,* 448
F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248 (1986)).  Material issues are those that could affect
the outcome of the action.  *Wyatt v. Hunt Plywood Co., Inc.*, 297
F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188
(2003).  The court must view all evidence in a light most
favorable to the non-moving party.  *Piazza's Seafood World, LLC,*

---

[33] While the Adversary Proceeding involves a plaintiff whose
bankruptcy case ended many, many years ago, the Fifth Circuit has
concluded in different contexts over the years that bankruptcy
subject matter jurisdiction remains post-confirmation, and even
after a bankruptcy case is closed, for such matters as
enforcing/interpreting the scope of a debtor's discharge order
and addressing alleged violations of it.  *See, e.g., Bradley v.
Barnes (In re Bradley)*, 989 F.2d 802 (5th Cir. 1993).

448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Factual
controversies must be resolved in favor of the non-movant, "but
only when there is an actual controversy, that is, when both
parties have submitted evidence of contradictory facts." *Little
v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the
movant satisfies its burden, the non-movant must then come
forward with specific evidence to show that there is a genuine
issue of fact. *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v.
Corley,* 992 F.2d 540, 543 (5th Cir. 1993). The non-movant may
not merely rely on conclusory allegations or the pleadings.
*Lockett,* 337 F. Supp. 2d at 891. Rather, it must demonstrate
specific facts identifying a genuine issue to be tried in order
to avoid summary judgment. FED. R. CIV. P. 56(c)(1); *Piazza's
Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at
891. Thus, summary judgment is proper if the non-movant "fails
to make a showing sufficient to establish the existence of an
element essential to that party's case." *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986).

A.    *Did the Post-Confirmation Tort Claimants Have Pre-
      Confirmation Claims Against Placid?*

An order of discharge in bankruptcy can only discharge
claims that arose before the entry of that order. *See* 11 U.S.C.
§§ 524(a), 1141(d) (2010). Thus, in order to determine if the
claims asserted in the State Court Petition by the Post-

12

Confirmation Tort Claimants were discharged by the Plan, the court must first determine if the Post-Confirmation Tort Claimants even had a "claim" in Placid's Bankruptcy Case prior to the Confirmation Order being entered.

Section 101(5)(A) of the Bankruptcy Code defines "claim," in relevant part, as a ***right to payment***, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A) (2010) (emphasis added). The legislative history of the Bankruptcy Code indicates that Congress intended the term "claim" to be given a broad interpretation so that "all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case." *See* H.R. Rep. No. 95-595, at 162 (1977). *See also Jaurdon v. Cricket Commc'ns, Inc.*, 412 F.3d 1156, 1158 (10th Cir. 2005). Based upon this legislative history and the express language of section 101(5)(A) of the Bankruptcy Code, the Fifth Circuit has recognized that the definition of "claim" under the Bankruptcy Code is much broader than what existed under the former Bankruptcy Act. *See Lemelle v. Universal Mfg. Corp. (In re Lemelle)*, 18 F.3d 1268, 1275 (5th Cir. 1994) *(citing Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.),* 730 F.2d 367, 375 n. 6 (5th Cir. 1984)). How broad this term "claim" is under the Bankruptcy Code, however, can be complex, especially as

13

it relates to unaccrued tort liability.

In *Lemelle*, the Fifth Circuit considered the question of how broad the term "claim" is under the Bankruptcy Code. *Lemelle*, 18 F.3d at 1275. As a brief background, the plaintiff in *Lemelle* brought a wrongful death action against a successor corporation of a mobile home manufacturer that had emerged from chapter 11. *Id.* at 1270-71. The plaintiff in *Lemelle* alleged that her injury was caused by the manufacturer's defective mobile home design and construction. *Id.* Specifically, the plaintiff's sons had died in a fire allegedly caused by a manufacturing defect approximately two years after the debtor's plan was confirmed and approximately fifteen years after the original design and manufacture of the mobile home. *Id.* The district court determined that the plan of reorganization discharged all of the debtor's obligations, including the liability on the plaintiff's tort claim. *Id.* at 1274. After analyzing the claim in detail, however, the Fifth Circuit ultimately reversed the district court. *Id.* at 1278.

The Fifth Circuit began by discussing various approaches that courts have taken when determining whether a tort claim arose pre-petition, thereby giving rise to a dischargeable claim. The Fifth Circuit first noted that some courts have taken the view that "a 'claim' does not arise in bankruptcy until a cause of action has accrued under non-bankruptcy law" (*i.e.,* until

14

there is a right to sue under non-bankruptcy law). *Id.* at 1275.[34] The Fifth Circuit then observed that other courts have rejected this "accrual theory," as interpreting the definition of "claim" too narrowly, and have instead found that a claim arises based on the debtor's "conduct," and that "if a debtor's conduct forming the basis of liability occurred pre-petition, a 'claim' arises under the Code when that conduct occurs, even though the injury resulting from this conduct is not manifest at the commencement of the bankruptcy proceedings." *Id.* Obviously, the "accrual" theory or test, and the "conduct" test are at opposite ends of the spectrum. In rejecting both of these approaches, the Fifth Circuit ultimately seemed to embrace what is known as the "pre-petition relationship test" (which might fairly be described as a test in the middle of the spectrum between "accrual" and "conduct"), which test provides that a "claim arises at the time of the debtor's negligent conduct forming the basis of liability ***only if*** the claimant had some type of specific relationship with the debtor at that time." *Id.* at 1276 (emphasis in original). Relying on the principles articulated in *In re Piper Aircraft Corp.,* 162 B.R. 619 (Bankr. S.D. Fla. 1994), *aff'd, Epstein v.*

---

[34] The court would note that the authority the Fifth Circuit referenced for this approach, *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332, 337 (3d Cir. 1984), *cert denied*, 469 U.S. 1160 (1985), was recently overruled by the Third Circuit in *Jeld-Wen, Inc. v. Gordan Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010).

*Official Comm. of Unsecured Creditors of the Estate of Piper Aircraft Corp. (In re Piper Aircraft Corp)*, 58 F.3d 1573, 1577 (11th Cir. 1995), specifically that "there must be some prepetition relationship, such as **contact**, **exposure**, impact, or privity, between the debtor's pre-petition conduct and the claimant" in order to have a "claim" under the Bankruptcy Code, the Fifth Circuit in *Lemelle* found the record before it devoid of any evidence of any pre-petition contact, privity or other relationship between the debtor and the plaintiff.  *Id.* at 1277 (emphasis added).  The court further stated that "the broad definition of 'claim' cannot be extended to include Forbes [the plaintiff] or the decedents as claimants whom the record indicates was completely unknown and unidentified at the time Winston [the debtor] filed its petition and whose rights **depended entirely on the fortuity of future occurrences**."  *Id.* (emphasis added)*.*

The Post-Confirmation Tort Claimants have argued that the current test in the Fifth Circuit, derived from the holding in *Lemelle*, is not the "pre-petition relationship test," but rather a more stringent "fair contemplation test," as first articulated by Judge Sanders in *In re National Gypsum*, 139 B.R. 397 (N.D. Tex. 1992).[35]  The "fair contemplation test" is similar to the

---

[35] *National Gypsum* involved an environmental claim under CERCLA and was not a wrongful death action, or moreover, not an

"pre-petition relationship test," but essentially layers onto the "pre-petition relationship test" a requirement that the claim (to have actually reached fruition pre-discharge) must have essentially sprung into the claimant's consciousness before discharge—*i.e.,* the claimant must have had a "fair contemplation" that the claim might exist. Otherwise, how does a claimant have any awareness of a potential need to participate in the bankruptcy by filing a proof of claim? This court acknowledges that the "fair contemplation of the parties" was a concept discussed in *Lemelle* (as being a consideration in various of the cases surveyed). But the court does not agree that this is the adopted test in the Fifth Circuit (at least not outside the context of environmental claims). First, the *Lemelle* court merely discussed the "fair contemplation of the parties" concept and did not need to address whether this extra layer of analysis was necessary (on top of the "pre-petition relationship test"), since there was no prepetition relationship extant in *Lemelle*. Second, the Fifth Circuit acknowledged in *La. Dept. Of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, n. 1 (5th Cir. 1998) that *Lemelle* did not specifically adopt the "fair-contemplation test" as articulated in *National Gypsum*, but only looked to it for first principles. Moreover, the Fifth Circuit in *Egleston v. Egleston (In re Egleston)*, 448 F.3d 803,

_____

asbestos related action.

17

813 (5th Cir. 2006), specifically noted that the "pre-petition relationship test" was applied in *Lemelle*, and went on to use the "pre-petition relationship" test in determining whether a claim arose pre-petition.[36]

The court must further note that asbestos claims (which were not involved in *Lemelle*) are quite unique, in that exposure (*i.e.,* the injury) and the manifestation of such injury, occur at different times. Thus, a claimant could be exposed to asbestos pre-petition and may not actually manifest the disease until many years after the plan is confirmed. The Fifth Circuit has not specifically ruled on the requisite test to apply in the context of an unknown asbestos claimant; however, the Third Circuit in *Jeld-Wen, Inc. v. Gordan Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010), as well as several other bankruptcy courts, have all found that, for purposes of determining whether there is a claim under section 101 of the Bankruptcy Code, an

---

[36] *Egleston* is not factually relevant, in that it involved a debtor's ex-wife's post-discharge litigation against her ex-husband, and what claims of the ex-wife had been discharged and which had not. However, *Egleston* discusses the Bankruptcy Code's expansive definition of "claim" and the *Lemelle* decision, and states that in *Lemelle*, the Fifth Circuit followed the approach of some courts that "have determined that a claim arises at the time the debtor's negligent conduct forming the basis of liability **only if** the claimant had some specific relationship with the debtor at that time" (such as contact, privity, or other relationship). *Egleston*, 448 F.3d at 813 (emphasis in original).

18

asbestos claim arises when exposure to asbestos occurs.[37]

Applying these principals to the case at hand, the undisputed summary judgment evidence shows that Mrs. Williams was entirely exposed to asbestos (*vis-a-vis* her husband's work clothes, while he was employed by Placid) **prior** to confirmation of the Debtor's Plan.  It was this **exposure** that created the requisite "pre-petition relationship," thereby meeting the Fifth Circuit's and other courts' requirements for having a "claim" under section 101 of the Bankruptcy Code.  Moreover, the court would note that, unlike the plaintiff in *Lemelle*, whose claim depended entirely on the "fortuity" of future occurrences (*i.e.*, the injury suffered and the manifestation of that injury both occurred simultaneously post-petition), the Post-Confirmation Tort Claimants' claims do not necessarily possess the "fortuitous" nature that the *Lemelle* claimants encountered, due to the fact that here, the injury actually occurred when Mrs. Williams was **exposed** to asbestos and not when it manifested many

---

[37] *See In re Chateaugay*, Nos. 86 B 11270(BRL) to 86 B 11334(BRL), 86 B 11402(BRL), 86 B 11464(BRL), 2009 WL 367490, at *6 (Bankr. S.D.N.Y. Jan. 14, 2009) (holding that under bankruptcy law, the Plaintiffs' wrongful death claims arose prepetition when the decedents were exposed to asbestos); *In re Quigley Co.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) (finding that if a claimant was exposed to asbestos before the petition date, he or she holds a claim); *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 424 (Bankr. D. Md. 2007) (holding that an asbestos-related claim arises upon exposure, not manifestation).

years later.[38]

Establishing a "claim" under section 101 of the Bankruptcy Code, however, is only the first step in determining whether the Post-Confirmation Tort Claimants' claims were discharged.  The court must now determine whether Mrs. Williams and the Post-Confirmation Tort Claimants were given fair and reasonable notice of the Bankruptcy Case and related claims bar date, sufficient to meet due process requirements.

B.    *Were the Post-Confirmation Tort Claimants Given Proper Notice of the Claims Bar Date by Placid?*

Notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality . . ."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  All creditors are entitled to due process, which

---

[38] Even if the Post-Confirmation Tort Claimants are correct that the "fair contemplation test" is the correct test for this case, the court believes that the summary judgment evidence requires a conclusion that these claims (while unmatured and unknown) were, indeed, in the "fair contemplation" of the Williams Defendants prior to the September 30, 1988 confirmation date.  Mr. Williams testified in his deposition that he was aware of the presence of asbestos-containing materials at the Black Lake Facility and was aware of the hazards of asbestos-exposure prior to the sale of the Black Lake Facility to NERCO.  *See* Defendants' Exhibit 1-E, pp. 42-43 of the Deposition Testimony. Moreover, by the mid-1980's, the hazards of asbestos were common, public knowledge.  *See* Placid's Response Exhibits C & C-1 through C-28 (various articles in the popular press, in the 1970's and 1980's, warning of the perils of asbestos, in products ranging from play sand, to brake lining, to wall-patching and spackling, *etc.*, and describing the dangers to workers and their families) (several of which articles appeared in Louisiana newspapers, as well as national publications like *Newsweek*).

requires notice of events in a bankruptcy case that may affect their rights. As set forth in *Mullane*, this means:

> notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonable to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Id.* However, the application of this requirement depends on the specific circumstances of each creditor, and bankruptcy courts have distinguished the requisite notice that must be given to "known" creditors and "unknown" creditors.

### i. Were the Post-Confirmation Tort Claimants "Known" or "Unknown" Creditors?

"Unknown" creditors are ones "whose identities or claims are not reasonably ascertainable and those who have merely conceivable, conjectural, or speculative claims." *See Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992). As to unknown creditors, the "debtors need only to have made reasonable diligent efforts to uncover the identities and claims of any creditors; they are not required to search out each conceivable or possible creditor." *Id.* A creditor is "reasonably ascertainable" if it can be discovered through "reasonably diligent efforts." *Crystal Oil*, 158 F.3d at 297. Moreover, "for a claim to be reasonably ascertainable, the debtor must have in its possession, at the very least, some specific information that reasonably suggests both the claim for which the

debtor may be liable and the entity to whom he would be liable." *Id.* Alternatively, "known creditors" include both those claimants actually known to the debtor, as well as those whose identities are "reasonably ascertainable." *Id.*

Here, the court finds that, as a matter of law, the Post-Confirmation Tort Claimants' claims were not reasonably ascertainable by Placid at the time the Confirmation Order was entered. Placid had no specific information that Mrs. Williams, the wife of an employee that worked for Placid, would develop mesothelioma fifteen years after the Bankruptcy Case was concluded. The Post-Confirmation Tort Claimants' claims were at best, conceivable, conjectural, or speculative at that point in time. In fact, the highly speculative nature of these claims is evidenced by the fact that neither Mr. Williams, nor any other Placid employee for that matter, ever developed mesothelioma as a result of exposure to asbestos. Thus, the court finds that at the time the Confirmation Order was entered, the Post-Confirmation Tort Claimants were unknown creditors.

### ii. What Form of Notice was Required to Discharge the Post-Confirmation Tort Claimants' Claims?

Having determined that the Post-Confirmation Tort Claimants were unknown creditors, the court must now determine what form of notice Placid was required to give the Post-Confirmation Tort Claimants to satisfy due process requirements and ultimately discharge their claims. In general, for unknown creditors whose

identities and claims are not reasonably ascertainable, and for creditors who hold only conceivable, conjectural, or speculative claims, constructive notice of the bar date by publication is sufficient. *Id.*; *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995), *cert. denied*, 517 U.S. 1137 (1996) (toxic tort claimants' due process rights were met through publication notice where "it is well established that, in providing notice to unknown creditors, constructive notice of the bar claims date by publication satisfies the requirements of due process").

Here, Placid published notice of the bar date on three separate occasions in the *Wall Street Journal* and such publication notice was, under the circumstances and facts of this case, sufficient as to the Post-Confirmation Tort Claimants' claims. The court recognizes that barring claims held by persons who may not have been aware of their claims on or before the bar date can be a harsh result for certain claimants. Because of this, in some instances, a future claims representative is appointed to act as a guardian for the unknown future claims. *See Chateaugay*, 2009 WL 367490, at *6. For example, where a debtor knows that it is facing significant tort liability due to asbestos exposure, it may be reasonable for the debtor to appoint a future claims representative.[39]  *Id.*  Here, based on the

---

[39] The court would note that the safeguards that Congress enacted in section 524(g) of the Bankruptcy Code to address asbestos liability and notice concerns, with regard to claimants

summary judgment evidence, the court does not believe, as a matter of law, that it would have been reasonable for Placid to appoint a future claims representative in its case. First, there had been no prepetition asbestos incidents or events that would even have suggested an awareness of a potential class of asbestos claimants. Second, it is ***highly significant*** that, to the best of Placid's knowledge, the State Court Petition has been the only asbestos-related personal injury claim that has ever been filed against it. Thus, it would not have been reasonably necessary to appoint a future claims representative, and the publication notice was sufficient in discharging the Post-Confirmation Tort Claimants' claims. Due process requires reasonable notice under the circumstances. Here, Placid had hundreds of employees worldwide and no asbestos claims had ever been asserted against it. Since no asbestos claims had ever been asserted against it, sending actual notice to employees and their families would not have been reasonable. Moreover, a future claims representative would not have been a reasonable or practical tool—when again, no asbestos claims had been asserted and Placid was an oil

---

who may not be aware of their claims against a debtor, were not in existence during the Placid Bankruptcy Case, since section 524(g) of the Bankruptcy Code was not enacted until 1994. While some of the mechanisms embodied in section 524(g) of the Bankruptcy Code were starting to be used prior to the Placid Confirmation Order, Placid (it is undisputed) had never been subjected to asbestos claims, so there would have been no reason for it to consider the type of mechanisms embodied in section 524(g) of the Bankruptcy Code.

company—not an asbestos manufacturer or distributor or other entity that had reason to expect mass tort claims in the future. The law does not require unreasonable acts in the name of due process. *Tulsa Prof'l Collection Servs. v. Pope*, 485 U.S. 478, 490 (1988).

## IV. CONCLUSION

Bankruptcy courts frequently struggle with the conflicting policy demands that exist between a debtor and its creditors. Life and our laws are not perfect—and the bankruptcy system is no exception. On one side of the coin is the bankruptcy policy goal of providing debtors with fresh starts and resolving claims arising from their pre-bankruptcy conduct. Relatedly, there is also the strong policy concern of preserving the finality of orders. On the other side of the coin are the due process rights of potential creditors who may have been damaged by a debtor's pre-petition conduct, but who may have been unaware of the harm or potential harm. Here, this court follows the majority of cases in the asbestos-bankruptcy context (and what it perceives to be the Fifth Circuit "pre-petition relationship" standard) and find that prepetition, dischargeable claims existed *vis-a-vis* the Post-Confirmation Tort Claimants and Placid. Further, based upon the facts and circumstances of this particular case, the court ultimately concludes that due process as to the Post-Confirmation Tort Claimants was met (*i.e.,* publication notice to these

"unknown creditors" was sufficient—with no need for actual notice to them or a trust mechanism or future claim representative), and, thus, Placid is entitled to keep intact the fresh start of its decades-old discharge.  Accordingly, it is

**ORDERED** that Placid's MSJ is ***granted***; it is further

**ORDERED** that the Post-Confirmation Tort Claimants' MSJ is ***denied***; and it is further

**ORDERED** that counsel for Placid shall upload a separate form of Judgment that the Post-Confirmation Tort Claimants' Claims in the State Court Petition were discharged by the Confirmation Order and that the Post-Confirmation Tort Claimants are enjoined from pursuing the State Court Petition or any related claims in any court, tribunal, or administrative agency.

**###END OF MEMORANDUM OPINION AND ORDER###**