U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS



# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed January 18, 2012**

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PLACID OIL COMPANY, | § | Case No. 86-33419-SGJ-11 |
|     Debtor. | § | |
| PLACID OIL COMPANY, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 09-03356-SGJ |
| | § | |
| JIMMY WILLIAMS, SR., JIMMY | § | |
| WILLIAMS, JR., DALTON GLEN | § | |
| WILLIAMS, JEANETTE WILLIAMS | § | |
| SHOWS, & GWENDOLYN WILLIAMS | § | |
| PEACOCK, Individually and on | § | |
| behalf of the deceased, MYRA | § | |
| WILLIAMS, | § | |
|     Defendants. | § | |

### REVISED MEMORANDUM OPINION AND ORDER: (1) GRANTING MOTION FOR SUMMARY JUDGMENT OF REORGANIZED DEBTOR PLACID OIL COMPANY [DE # 26]; AND (2) DENYING MOTION FOR SUMMARY JUDGMENT OF POST-CONFIRMATION TORT CLAIMANTS [DE # 29]

Before this court are cross motions for summary judgment,

responses, and supporting documentary evidence in the above-

-1-

referenced adversary proceeding (the "Adversary Proceeding").[1]

Placid Oil Company ("Placid" or "Reorganized Debtor"), the Plaintiff in this Adversary Proceeding, was in a Chapter 11 bankruptcy case in the mid-1980s. Placid filed this Adversary Proceeding, approximately two decades after confirmation of a Chapter 11 plan and closure of its bankruptcy case, in order to determine whether certain tort claims that have been asserted in a Louisiana state court, post-confirmation, by Jimmy Williams, Sr., Jimmy Williams, Jr., Dalton Glen Williams, Jeanette Williams Shows, and Gwendolyn Williams Peacock, individually and on behalf of the deceased, Myra Williams (collectively, the "Post-

---

[1] Specifically, the court refers to: (1) Placid Oil Company's Motion for Summary Judgment and Brief in Support That Defendants' Claims Against Placid Oil Company Were Discharged in the Chapter 11 Case and are Forever Barred along with Exhibits A-O [DE ## 26, 27 & 28] (collectively, "Placid's MSJ"); (2) the Williams Defendants' Response and Brief in Opposition to Placid Oil Company's Motion for Summary Judgment [DE ## 36 & 37]; (3) the Williams Defendants' Motion for Summary Judgment and Brief in Support along with Exhibits 1, 1-A, 1-B, 1-C, 1-D, 1-E, and 1-F [DE ## 29, 30 & 31] (collectively, the "Post-Confirmation Tort Claimants' MSJ"); (4) Placid Oil Company's Response and Brief in Opposition to Defendants' Motion for Summary Judgment along with Exhibits A, B, B-1, B-2, C, C-1, C-2, C-3, C-4, C-5, C-6, C-7, C-8, C-9, C-10, C-11, C-12, C-13, C-14, C-15, C-16, C-17, C-18, C-19, C-20, C-21, C-22, C-23, C-24, C-25, C-26, C-27, and C-28 ("Placid's Response") [DE ## 33, 34 & 35]; and (5) Notice of New Case Law Authority [DE # 40]. At the hearing held on the cross motions for summary judgment, the court orally granted Placid Oil Company's Motion to Strike Defendants' Untimely Reply and Brief in Support [DE # 50], which related to the Williams Defendants' Reply to Placid Oil Company's Response and Brief in Opposition to Defendants' Motion for Summary Judgment [DE ## 48 & 49] (collectively, "Defendants' Reply"). Accordingly, the court did not consider the Defendants' Reply in reaching its ruling contained herein.

Confirmation Tort Claimants," "Williams Defendants," or "Defendants"), were discharged by the Confirmation Order in Placid's chapter 11 case.

On March 21, 2011, this Adversary Proceeding seemed to be concluded, when this court entered a Memorandum Opinion and Order: (1) Granting Motion for Summary Judgment of Reorganized Debtor Placid Oil Company; and (2) Denying Motion for Summary Judgment of Post-Confirmation Tort Claimants [DE ## 58 & 59] (the "Original Opinion").  Then, on June 8, 2011, Placid filed a Motion to Reopen Summary Judgment Record and to Alter or Amend Memorandum Opinion (the "Motion to Reopen") [DE # 78].  The Motion to Reopen was filed due to certain late-discovered errors that were contained in an "Agreement of Counsel Regarding Assumed Facts for Adversary Proceeding 09-3356" and submitted to the court as part of the original summary judgment record. Specifically, these late-discovered errors had to do with the number of post-confirmation, asbestos-related claims that have been brought over the last several decades against Placid.  On July 27, 2011, the Court entered its Order Reopening Summary Judgment Record and Setting Filing Deadlines [DE # 81] (the "Order Reopening Record").  The Order Reopening Record allowed for the filing of a "Revised Agreement of Counsel Regarding Assumed Facts for Adversary Proceeding 09-3356" (the "Revised

-3-

Agreement")[2] as well as additional briefing by both Placid and the Williams Defendants, but only as to issues raised by the changes to the assumed facts.  After considering the Revised Agreement filed on August 18, 2011 at Docket Entry # 86 (along with the Gary Affidavit in support), as well as the additional briefing,[3] the court has concluded that the revised facts do not impact the ultimate ruling contained in the Original Opinion, but, that certain revisions to the Original Opinion are, nonetheless, necessary.  For the reasons set forth below: (1) Placid's MSJ is **granted**; and (2) the Post-Confirmation Tort Claimants' MSJ is **denied**.  This Revised Memorandum Opinion and Order is issued pursuant to Federal Rule of Bankruptcy Procedure 7056.

---

[2] Per the Order Reopening Record, Placid also filed an additional summary judgment Affidavit of Claudia H. Gary on August 9, 2011 at Docket Entry # 83 (the "Gary Affidavit"), verifying the accuracy of the revised information regarding post-confirmation, asbestos-related claims that were set forth in the Revised Agreement.

[3] In light of the Revised Agreement, both Placid and the Williams Defendants each submitted a supplemental appendix along with their briefing [DE ## 89 and 91].  The Supplemental Appendices submitted by Placid and the Williams Defendants each contained the Revised Agreement.  The Williams Defendants' Supplemental Appendix also included the Affidavit of Debra L. Innoncenti (Defendants' Supplemental Exhibit 1) as well as several other pleadings that were filed with the court in this Adversary Proceeding (Defendants' Supplemental Exhibits 1-A, 1-B, 1-C, 1-D, and 1-E).

## I. UNDISPUTED MATERIAL FACTS[4]

A.   *The Placid Bankruptcy Case*

Placid is an oil and gas company that was, at least at the time of its bankruptcy filing, headquartered in Dallas, Texas. In connection with its business, Placid formerly owned and operated a large natural gas field and processing facility in Black Lake, Natchitoches Parish, Louisiana (the "Black Lake Facility").

In the mid-1980s, the price of oil dropped precipitously, and Placid was unable to continue paying its debts.  In order to prevent a threatened foreclosure, Placid commenced the above-referenced bankruptcy case (the "Bankruptcy Case").  On November 19, 1986, the court entered an Order Setting Bar Date [DE # 1184 in the Bankruptcy Case], which set January 31, 1987 as the bar date for potential creditors of Placid to file claims.[5]  On three

---

[4] The majority of the facts in this Adversary Proceeding are agreed by the parties to be undisputed, as set forth in the Revised Agreement.  Placid's Supplemental Exhibit A and the Defendants' Supplemental Exhibit 1-F, are identical copies of the Revised Agreement.  The remaining summary judgment evidence will be referred to as "Placid's Exhibit __" [*see* DE # 28], "Defendants' Exhibit __" [*see* DE # 30], "Placid's Response Exhibit __" [*see* DE # 35], "Placid's Supplemental Exhibit __" [*see* DE # 89], or "Defendants' Supplemental Exhibit __" [*see* DE # 91].  The court also has discretion to take judicial notice of all documents filed with this court in the Adversary Proceeding. *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).

[5] *See* Placid's Exhibit D.

-5-

occasions (*i.e.,* on January 2, 1987, January 9, 1987, and January 16, 1987), a Notice of Bar Date was published in the *Wall Street Journal*, a newspaper of national circulation that was available in Louisiana.[6]

During the course of the Bankruptcy Case (specifically, in June 1988), Placid sold the Black Lake Facility to NERCO Oil and Gas, Inc., pursuant to a Bankruptcy Code section 363 sale order, in order to eventually fund a plan of reorganization.[7] Three months later, on September 30, 1988, Placid confirmed its Fourth Amended Plan of Reorganization (the "Plan"). The Order confirming the Debtor's Plan (the "Confirmation Order") provided that all claims against Placid that arose on or before September 30, 1988 (*i.e.,* the confirmation date), were forever discharged except for the Reorganized Debtor's obligations under the Plan (the "Discharge").[8] The Confirmation Order also prohibited claimants from pursuing the Reorganized Debtor to enforce any claims that fell within the scope of the Discharge (the "Discharge Injunction").[9] It has been agreed, for purposes of this Adversary Proceeding that, pre-confirmation, no asbestos-

---

[6] *See* Placid's Exhibits E, F & G.

[7] *See* Placid's Exhibit K.

[8] *See* Placid's Exhibit L, paragraph 2.

[9] *See* Placid's Exhibit L, paragraph 5.

related claims had ever been filed against Placid.[10]

B.   *The Claims of the Post-Confirmation Tort Claimants*

The Post-Confirmation Tort Claimants are the surviving widower (age 69) and four adult offspring (in their 30's and 40's) of Mrs. Myra Williams ("Mrs. Williams").  The Post-Confirmation Tort Claimants allege that they have suffered damages due to the death of Mrs. Williams, on August 9, 2003, allegedly caused by Mrs. Williams' exposure to asbestos dust and fibers when she handled and laundered the allegedly asbestos-laden clothing of her husband, Jimmy Williams, Sr. ("Mr. Williams").  Mr. Williams was employed at the Black Lake Facility, first by Placid, between 1966 and 1988, and then by NERCO and other subsequent owners of the Black Lake Facility, from 1988 to 1995.  Thus, Mr. Williams worked at the Black Lake Facility for almost 30 years (1966-1995).  In the course of performing his work, the parties agree that Mr. Williams was occupationally exposed to large quantities of asbestos-containing insulation products that were utilized and/or handled by, or in the close proximity of, Mr. Williams.[11]  Mr. Williams' initial

---

[10] *See* Placid's Supplemental Exhibit A, paragraph 12. Moreover, no asbestos-related claims were asserted against Placid before the Bankruptcy Case was administratively closed on April 7, 1997.  *Id*.

[11] *See* Placid's Supplemental Exhibit A, paragraph 2.

job for Placid was a switcher.[12]  When he was a switcher, he
worked with steam coils on certain flow lines and each of them
was covered with insulation containing asbestos.[13]  Also, certain
heaters within the work area had insulation in them.[14]  Mr.
Williams later became a compressor operator and then a chief
operator.[15]  When he was a compressor operator, he worked with
turbochargers, engines, and compressors that had insulation on
them.[16]  Mr. Williams later became a member of a maintenance crew
(repairing anything that broke throughout the plant).[17]   Mr.
Williams also stated that he believes that he was exposed to
asbestos at the Black Lake Facility through certain pipe
insulation—specifically "hot oil piping" used in the process of
"drying" natural gas—*i.e.,* removing propanes and pentanes from
the hydrocarbon gas (Mr. Williams testified that pipes carrying

---

[12] *See* Placid's Response Exhibit A, p. 27 of the Deposition
Testimony.

[13] *See* Placid's Response Exhibit A, pp. 28-29 of the
Deposition Testimony.

[14] *See* Placid's Response Exhibit A, p. 29 of the Deposition
Testimony.

[15] *See* Defendants' Exhibit 1-E, p. 32 of the Deposition
Testimony.

[16] *See* Defendants' Exhibit 1-E, p. 33 of the Deposition
Testimony.  *See also* Placid's Response Exhibit A, pp. 32-33 of
the Deposition Testimony.

[17] *See* Defendants' Exhibit 1-E, p. 42 of the Deposition
Testimony.

-8-

the hot oil had pipe insulation around them and this pipe insulation contained asbestos).[18] Mr. Williams believes, in particular, that he may have been exposed to asbestos dust in the compressor building at the Black Lake Facility where, once a year or so, he would have to pull out, repair, or rip off pipe insulation.[19] In summary, Mr. Williams occasionally handled or was near items with insulation containing asbestos.

It is agreed, for purposes of this Adversary Proceeding, that upon completion of Mr. Williams' daily work, he would leave the worksite and return home with asbestos dust and fibers on his clothing and person.[20] It is further agreed, for purposes of this Adversary Proceeding, that Mrs. Williams was then exposed to the asbestos dust and fibers when she gathered, handled, and laundered Mr. Williams' dust-laden clothing and ultimately sustained a very serious injury to her body.[21]

In 2003, Mrs. Williams suddenly developed pain and trouble breathing.[22] Shortly thereafter, Mrs. Williams was diagnosed

---

[18] *See* Defendants' Exhibit 1-E, pp. 25-27 of the Deposition Testimony.

[19] *See* Defendants' Exhibit 1-E, p. 33 of the Deposition Testimony.

[20] *See* Placid's Supplemental Exhibit A, paragraph 2.

[21] *See* Placid's Supplemental Exhibit A, paragraphs 3 and 4.

[22] *See* Placid's Supplemental Exhibit A, paragraph 6.

with the asbestos-related lung cancer known as mesothelioma.[23] Mrs. Williams' contraction of mesothelioma resulted in immediate disability, physical pain and suffering, and severe mental stress, and she soon passed away, on August 9, 2003.[24]

On March 15, 2004, the Post-Confirmation Tort Claimants filed their Petition for Survival and Wrongful Death Damages in the Tenth Judicial District of the Parish of Nachitoches, State of Louisiana, which has since been amended by the First Supplemental and Amending Petition, the Second Supplemental and Amending Petition, and the Third Supplemental and Amending Petition (collectively, the "State Court Petition").[25]  The State Court Petition seeks compensation for personal injury under the survival statute, and for the alleged wrongful death of Mrs. Williams.[26]

---

[23] *See* Placid's Supplemental Exhibit A, paragraph 5.

[24] *See* Placid's Supplemental Exhibit A, paragraph 7.

[25] *See* Defendants' Exhibit 1-D.  The original state court petition was amended to add new defendants as they became known.

[26] Note that the asbestos-containing insulation products that Mr. Williams was allegedly exposed to were actually manufactured, distributed, marketed, or sold by various **other**, unrelated defendants who have also been sued by the Post-Confirmation Tort Claimants.  In other words, Placid is one of but many unrelated parties that have been sued by the Post-Confirmation Tort Claimants.

C.  *Placid's Motion to Reopen the Chapter 11 Case and the Filing of the Adversary Proceeding*

On November 19, 2008, Placid[27] filed its Motion to Reopen Chapter 11 Case to Determine that Certain Pre-Petition Claims Were Discharged and to Enforce the Discharge Injunction [DE # 4625 in the Bankruptcy Case]. On January 22, 2009, the court granted Placid's motion, reopening the Bankruptcy Case for the limited purpose of determining whether certain claims being asserted against Placid, including those articulated in the State Court Petition, came within the scope of the Discharge and Discharge Injunction [DE # 4643 in the Bankruptcy Case].

On September 30, 2009, Placid filed its Complaint to Determine the Defendants' Claims Were Discharged and to Enforce Discharge Injunction [DE # 1], thereby commencing this Adversary Proceeding. As earlier mentioned, for purposes of this Adversary Proceeding, Placid does not dispute that Mrs. Williams was exposed through her husband's asbestos-laden clothes to asbestos dust and fibers while her husband, Mr. Williams, was employed by Placid, at the Black Lake Facility.[28] Moreover, Placid acknowledges that the asbestos-containing insulation products that caused this exposure were in the care, custody, and control

---

[27] Placid is now a subsidiary of Occidental Petroleum Corporation and remains an active corporation that owns oil and gas interests. *See* Defendants' Exhibit 1-C, p. 6, paragraph 14.

[28] *See* Placid's Supplemental Exhibit A, paragraph 8.

of Placid up through June 1988 when it sold the Black Lake

Facility.[29]  Unlike Mrs. Williams, none of the Post-Confirmation

Tort Claimants has ever developed any asbestos-related illness

and are currently all healthy.[30]  Additionally, to Mr. Williams'

knowledge, none of his co-workers at the Black Lake Facility,[31]

nor any of their spouses, has ever developed an asbestos-related

illness.[32]  Finally, Mr. Williams has testified that he was

generally aware of Placid's Bankruptcy Case but does not recall

employee meetings or updates or reading anything in the newspaper

regarding the Bankruptcy Case.[33]

D.   *Asbestos-Related Claims Filed Against Placid After the*
     *Bankruptcy Case Was Closed*

Except as set forth below (in the discussion of Placid

Refining Company), since Placid's Bankruptcy Case was closed,

only nine (9) claims alleging personal injury caused by exposure

to asbestos, including this Adversary Proceeding, have been filed

---

[29] *See* Placid's Supplemental Exhibit A, paragraph 2.

[30] *See* Placid's Supplemental Exhibit A, paragraph 9.

[31] Mr. Williams testified that there were 65-70 employees at the Black Lake Facility when Placid sold it to NERCO in 1980 (and all Placid employees became NERCO employees).  *See* Defendants' Exhibit 1-E, p. 49 of the Deposition Testimony.

[32] *See* Placid's Supplemental Exhibit A, paragraph 10.

[33] *See* Defendants' Exhibit 1-E, pp. 51 & 53 of the Deposition Testimony.

against Placid.[34] The first claim was a lawsuit filed against Placid in 1999 (approximately eleven years after confirmation) and the last was a lawsuit filed in 2010.[35] Four of these nine lawsuits pertained to the Black Lake Facility (actually two were the Black Lake "Field"), and five pertained to other locations.

Additionally, at the time Placid filed the Bankruptcy Case, it had several wholly-owned subsidiaries, including one named Placid Refining Company.[36] Placid Refining Company did not file bankruptcy along with Placid. In any event, between 1994 (six years after Placid's Confirmation Order was entered) and 2006, Placid Refining Company was named as a defendant in 31 lawsuits alleging asbestos-related injury due to activities of Placid Refining Company.[37] Placid was added as a defendant in these 31 lawsuits relating to Placid Refining Company's activities. With one exception, all these 31 lawsuits allege injuries arising out of alleged asbestos exposure at an oil refinery located in Port Allen, Louisiana (the "Port Allen Refinery").[38] The Port Allen Refinery was owned and operated by "Placid Refining Company, Port

---

[34] *See* Placid's Supplemental Exhibit A, paragraph 13.

[35] *Id. See also* Gary Affidavit, paragraph 4.

[36] *See* Placid's Supplemental Exhibit A, paragraph 14.

[37] *See* Placid Supplemental Exhibit A, paragraph 15.

[38] *Id.*

Allen Joint Venture," an entity that was owned 64.29% by Placid Refining Company.[39]  To be clear, Placid Refining Company was a separate corporation and wholly-owned subsidiary of Placid during the Bankruptcy Case, but it **did not** file bankruptcy and was not a debtor in Placid's Bankruptcy Case.[40]  In one of the 31 asbestos-related cases asserted against Placid Refining Company (and naming Placid), filed in 1995, the plaintiff's pleadings do not identify an exposure site.[41]

Except with regard to the 31 lawsuits against Placid Refining Company mentioned above, Placid has not found and is not aware of any asbestos-related lawsuits, asbestos-related claims, or references to any asbestos-related lawsuits against any other wholly owned subsidiaries of Placid.[42]  Moreover, of all the asbestos-related litigation that has occurred since the closing of Placid's Bankruptcy Case, Placid has not been found liable in a Placid Refining Company asbestos lawsuit and has not paid any

---

[39] *Id.*

[40] *Id.*

[41] *Id.*  Specifically, the Petition alleged "premises liability" without specifying the premises where the alleged exposure occurred or explaining why Placid or Placid Refining Company was named as a defendant.  Moreover, no facts alleged in the Petition indicate whether or not the alleged asbestos exposure even occurred at a Placid facility.  *Id.*  *See also* Gary Affidavit, ¶¶ 4, 5 & 6.

[42] *See* Placid's Supplemental Exhibit A, paragraph 14.  *See also* Gary Affidavit, paragraph 5.

money to settle such lawsuits.[43]  In addition, to date, Placid

has not been found liable in any lawsuit alleging asbestos

exposure at a Placid facility, nor has it paid any money to

settle such case.[44]

## II. JURISDICTION

This court has jurisdiction over this Adversary Proceeding

pursuant to 28 U.S.C. § 1334(b).[45]  This is a core proceeding

under 28 U.S.C. § 157(b)(2)(I).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate whenever a movant

establishes that the pleadings, affidavits, and other evidence

available to the court demonstrate that no genuine issue of

material fact exists, and the movant is, thus, entitled to

judgment as a matter of law.  FED. R. CIV. P. 56(a); *Piazza's*

*Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006*);*

*Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D.

Tex. 2004).  A genuine issue of material fact is present when the

---

[43] *See* Placid Supplemental Exhibit A, paragraph 16.

[44] *Id.  See also* Gary Affidavit, paragraphs 4 & 7.

[45] While the Adversary Proceeding involves a plaintiff whose
bankruptcy case ended many, many years ago, the Fifth Circuit has
concluded in different contexts over the years that bankruptcy
subject matter jurisdiction remains post-confirmation, and even
after a bankruptcy case is closed, for such matters as
enforcing/interpreting the scope of a debtor's discharge order
and addressing alleged violations of it.  *See, e.g., Bradley v.*
*Barnes (In re Bradley)*, 989 F.2d 802 (5th Cir. 1993).

evidence is such that a reasonable fact finder could return a verdict for the non-movant. *Piazza's Seafood World, LLC,* 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Material issues are those that could affect the outcome of the action. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).  The court must view all evidence in a light most favorable to the non-moving party. *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891.  Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the movant satisfies its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir. 1993).  The non-movant may not merely rely on conclusory allegations or the pleadings. *Lockett,* 337 F. Supp. 2d at 891.  Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment.  FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891.  Thus, summary judgment is proper if the non-movant "fails

to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A.   *Did the Post-Confirmation Tort Claimants Have Pre-Confirmation Claims Against Placid?*

An order of discharge in bankruptcy can only discharge claims that arose before the entry of that order. *See* 11 U.S.C. §§ 524(a), 1141(d) (2010). Thus, in order to determine if the claims asserted in the State Court Petition by the Post-Confirmation Tort Claimants were discharged by the Plan, the court must first determine if the Post-Confirmation Tort Claimants even had a "claim" in Placid's Bankruptcy Case prior to the Confirmation Order being entered.

Section 101(5)(A) of the Bankruptcy Code defines "claim," in relevant part, as a "***right to payment***, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A) (2010) (emphasis added). The legislative history of the Bankruptcy Code indicates that Congress intended the term "claim" to be given a broad interpretation so that "all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case." *See* H.R. Rep. No. 95-595, at 162 (1977). *See also Jaurdon v. Cricket Commc'ns, Inc.*, 412 F.3d 1156, 1158 (10th Cir. 2005).

-17-

Based upon this legislative history and the express language of section 101(5)(A) of the Bankruptcy Code, the Fifth Circuit has recognized that the definition of "claim" under the Bankruptcy Code is much broader than what existed under the former Bankruptcy Act. *See Lemelle v. Universal Mfg. Corp. (In re Lemelle)*, 18 F.3d 1268, 1275 (5th Cir. 1994) *(citing Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.),* 730 F.2d 367, 375 n. 6 (5th Cir. 1984)). How broad this term "claim" is under the Bankruptcy Code, however, can be complex, especially as it relates to unaccrued tort liability.

In *Lemelle*, the Fifth Circuit considered the question of how broad the term "claim" is under the Bankruptcy Code. *Lemelle*, 18 F.3d at 1275. As a brief background, the plaintiff in *Lemelle* brought a wrongful death action against a successor corporation of a mobile home manufacturer that had emerged from chapter 11. *Id.* at 1270-71. The plaintiff in *Lemelle* alleged that her injury was caused by the manufacturer's defective mobile home design and construction. *Id.* Specifically, the plaintiff's sons had died in a fire allegedly caused by a manufacturing defect approximately two years after the debtor's plan was confirmed and approximately fifteen years after the original design and manufacture of the mobile home. *Id.* The district court determined that the plan of reorganization discharged all of the

debtor's obligations, including the liability on the plaintiff's tort claim. *Id.* at 1274. After analyzing the claim in detail, however, the Fifth Circuit ultimately reversed the district court. *Id.* at 1278.

The Fifth Circuit began by discussing various approaches that courts have taken when determining whether a tort claim arose pre-petition, thereby giving rise to a dischargeable claim. The Fifth Circuit first noted that some courts have taken the view that "a 'claim' does not arise in bankruptcy until a cause of action has accrued under non-bankruptcy law" (*i.e.,* until there is a right to sue under non-bankruptcy law). *Id.* at 1275.[46] The Fifth Circuit then observed that other courts have rejected this "accrual theory," as interpreting the definition of "claim" too narrowly, and have instead found that a claim arises based on the debtor's "conduct," and that "if a debtor's conduct forming the basis of liability occurred pre-petition, a 'claim' arises under the Code when that conduct occurs, even though the injury resulting from this conduct is not manifest at the commencement of the bankruptcy proceedings." *Id.* Obviously, the "accrual" theory or test, and the "conduct" test are at opposite

---

[46] The court would note that the authority the Fifth Circuit referenced for this approach, *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332, 337 (3d Cir. 1984), *cert denied*, 469 U.S. 1160 (1985), was recently overruled by the Third Circuit in *Jeld-Wen, Inc. v. Gordan Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010).

ends of the spectrum. In rejecting both of these approaches, the Fifth Circuit ultimately seemed to embrace what is known as the "pre-petition relationship test" (which might fairly be described as a test in the middle of the spectrum between "accrual" and "conduct"), which test provides that a "claim arises at the time of the debtor's negligent conduct forming the basis of liability **only if** the claimant had some type of specific relationship with the debtor at that time." *Id.* at 1276 (emphasis in original). Relying on the principles articulated in *In re Piper Aircraft Corp.,* 162 B.R. 619 (Bankr. S.D. Fla. 1994), *aff'd*, *Epstein v. Official Comm. of Unsecured Creditors of the Estate of Piper Aircraft Corp. (In re Piper Aircraft Corp)*, 58 F.3d 1573, 1577 (11th Cir. 1995), specifically that "there must be some prepetition relationship, such as **contact**, **exposure**, impact, or privity, between the debtor's pre-petition conduct and the claimant" in order to have a "claim" under the Bankruptcy Code, the Fifth Circuit in *Lemelle* found the record before it devoid of any evidence of any pre-petition contact, privity or other relationship between the debtor and the plaintiff. *Id.* at 1277 (emphasis added). The court further stated that "the broad definition of 'claim' cannot be extended to include Forbes [the plaintiff] or the decedents as claimants whom the record indicates was completely unknown and unidentified at the time

Winston [the debtor] filed its petition and whose rights **depended entirely on the fortuity of future occurrences**." *Id.* (emphasis added).

The Post-Confirmation Tort Claimants have argued that the current test in the Fifth Circuit, derived from the holding in *Lemelle*, is not the "pre-petition relationship test," but rather a more stringent "fair contemplation test," as first articulated by Judge Sanders in *In re National Gypsum*, 139 B.R. 397 (N.D. Tex. 1992).[47] The "fair contemplation test" is similar to the "pre-petition relationship test," but essentially layers onto the "pre-petition relationship test" a requirement that the claim (to have actually reached fruition pre-discharge) must have essentially sprung into the claimant's consciousness before discharge—*i.e.,* the claimant must have had a "fair contemplation" that the claim might exist. Otherwise, how does a claimant have any awareness of a potential need to participate in the bankruptcy by filing a proof of claim? This court acknowledges that the "fair contemplation of the parties" was a concept discussed in *Lemelle* (as being a consideration in various of the cases surveyed). But the court does not agree that this is the adopted test in the Fifth Circuit (at least not outside the

---

[47] *National Gypsum* involved an environmental claim under CERCLA and was not a wrongful death action, or moreover, not an asbestos related action.

context of environmental claims).  First, the *Lemelle* court merely discussed the "fair contemplation of the parties" concept and did not need to address whether this extra layer of analysis was necessary (on top of the "pre-petition relationship test"), since there was no prepetition relationship extant in *Lemelle*. Second, the Fifth Circuit acknowledged in *La. Dept. Of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, n. 1 (5th Cir. 1998) that *Lemelle* did not specifically adopt the "fair-contemplation test" as articulated in *National Gypsum*, but only looked to it for first principles.  Moreover, the Fifth Circuit in *Egleston v. Egleston (In re Egleston)*, 448 F.3d 803, 813 (5th Cir. 2006), specifically noted that the "pre-petition relationship test" was applied in *Lemelle*, and went on to use the "pre-petition relationship" test in determining whether a claim arose pre-petition.[48]

The court must further note that asbestos claims (which were

---

[48] *Egleston* is not factually relevant, in that it involved a debtor's ex-wife's post-discharge litigation against her ex-husband, and what claims of the ex-wife had been discharged and which had not.  However, *Egleston* discusses the Bankruptcy Code's expansive definition of "claim" and the *Lemelle* decision, and states that in *Lemelle*, the Fifth Circuit followed the approach of some courts that "have determined that a claim arises at the time the debtor's negligent conduct forming the basis of liability *only if* the claimant had some specific relationship with the debtor at that time" (such as contact, privity, or other relationship).  *Egleston*, 448 F.3d at 813 (emphasis in original).

not involved in *Lemelle*) are quite unique, in that exposure
(*i.e.,* the injury) and the manifestation of such injury, occur at
different times. Thus, a claimant could be exposed to asbestos
pre-petition and may not actually manifest the disease until many
years after the plan is confirmed. The Fifth Circuit has not
specifically ruled on the requisite test to apply in the context
of an unknown asbestos claimant; however, the Third Circuit in
*Jeld-Wen, Inc. v. Gordan Van Brunt (In re Grossman's Inc.)*, 607
F.3d 114, 125 (3d Cir. 2010), as well as several other bankruptcy
courts, have all found that, for purposes of determining whether
there is a claim under section 101 of the Bankruptcy Code, an
asbestos claim arises when exposure to asbestos occurs.[49]

Applying these principles to the case at hand, the
undisputed summary judgment evidence shows that Mrs. Williams was
entirely exposed to asbestos (*vis-a-vis* her husband's work
clothes, while he was employed by Placid) ***prior*** to confirmation
of the Debtor's Plan. It was this ***exposure*** that created the

---

[49] *See In re Chateaugay Corp., Reomar, Inc.*, Nos. 86 B
11270(BRL) to 86 B 11334(BRL), 86 B 11402(BRL), 86 B 11464(BRL),
2009 WL 367490, at *6 (Bankr. S.D.N.Y. Jan. 14, 2009) (holding
that under bankruptcy law, the Plaintiffs' wrongful death claims
arose prepetition when the decedents were exposed to asbestos);
*In re Quigley Co.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008)
(finding that if a claimant was exposed to asbestos before the
petition date, he or she holds a claim); *In re Lloyd E. Mitchell,
Inc.,* 373 B.R. 416, 424 (Bankr. D. Md. 2007) (holding that an
asbestos-related claim arises upon exposure, not manifestation).

requisite "pre-petition relationship," thereby meeting the Fifth Circuit's and other courts' requirements for having a "claim" under section 101 of the Bankruptcy Code.  Moreover, the court would note that, unlike the plaintiff in *Lemelle*, whose claim depended entirely on the "fortuity" of future occurrences (*i.e.*, the injury suffered and the manifestation of that injury both occurred simultaneously post-petition), the Post-Confirmation Tort Claimants' claims do not necessarily possess the "fortuitous" nature that the *Lemelle* claimants encountered, due to the fact that here, the injury actually occurred when Mrs. Williams was ***exposed*** to asbestos and not when it manifested many years later.[50]

Establishing a "claim" under section 101 of the Bankruptcy

---

[50] Even if the Post-Confirmation Tort Claimants are correct that the "fair contemplation test" is the correct test for this case, the court believes that the summary judgment evidence requires a conclusion that these claims (while unmatured and unknown) could have, indeed, been in the "fair contemplation" of the Williams Defendants prior to the September 30, 1988 confirmation date.  Mr. Williams testified in his deposition that he was aware of the presence of asbestos-containing materials at the Black Lake Facility and was aware of the hazards of asbestos-exposure prior to the sale of the Black Lake Facility to NERCO. *See* Defendants' Exhibit 1-E, pp. 42-43 of the Deposition Testimony.  Moreover, by the mid-1980's, the hazards of asbestos were common, public knowledge.  *See* Placid's Response Exhibits C & C-1 through C-28 (various articles in the popular press, in the 1970's and 1980's, warning of the perils of asbestos, in products ranging from play sand, to brake lining, to wall-patching and spackling, *etc.*, and describing the dangers to workers and their families) (several of which articles appeared in Louisiana newspapers, as well as national publications like *Newsweek*).

Code, however, is only the first step in determining whether the Post-Confirmation Tort Claimants' claims were discharged. The court must now determine whether Mrs. Williams and the Post-Confirmation Tort Claimants were given fair and reasonable notice of the Bankruptcy Case and related claims bar date, sufficient to meet due process requirements.

B.    *Were the Post-Confirmation Tort Claimants Given Proper Notice of the Claims Bar Date by Placid?*

Notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality . . ." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). All creditors are entitled to due process, which requires notice of events in a bankruptcy case that may affect their rights. As set forth in *Mullane*, this means:

> notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonable to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Id.* However, the application of this requirement depends on the specific circumstances of each creditor, and bankruptcy courts have distinguished the requisite notice that must be given to "known" creditors and "unknown" creditors.

### i. Were the Post-Confirmation Tort Claimants "Known" or "Unknown" Creditors?

"Unknown" creditors are ones "whose identities or claims are not reasonably ascertainable and those who have merely conceivable, conjectural, or speculative claims." *See Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992). As to unknown creditors, the "debtors need only to have made reasonable diligent efforts to uncover the identities and claims of any creditors; they are not required to search out each conceivable or possible creditor." *Id.* A creditor is "reasonably ascertainable" if it can be discovered through "reasonably diligent efforts." *Crystal Oil*, 158 F.3d at 297. Moreover, "for a claim to be reasonably ascertainable, the debtor must have in its possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* Alternatively, "known creditors" include both those claimants actually known to the debtor, as well as those whose identities are "reasonably ascertainable." *Id.*

Here, the court finds that, as a matter of law, the Post-Confirmation Tort Claimants' claims were not reasonably ascertainable by Placid at the time the Confirmation Order was entered. Placid had no specific information that Mrs. Williams, the wife of an employee that worked for Placid, would be exposed

-26-

indirectly to asbestos from the Black Lake Facility and develop mesothelioma fifteen years after the Bankruptcy Case was concluded. The Post-Confirmation Tort Claimants' claims were at best, conceivable, conjectural, or speculative at that point in time. In fact, the highly speculative nature of these claims is evidenced by the fact that neither Mr. Williams, nor any other Placid employee for that matter (to Mr. Williams' knowledge),[51] ever developed mesothelioma as a result of exposure to asbestos. Thus, the court finds that at the time the Confirmation Order was entered, the Post-Confirmation Tort Claimants were unknown creditors.

**ii. What Form of Notice was Required to Discharge the Post-Confirmation Tort Claimants' Claims?**

Having determined that the Post-Confirmation Tort Claimants were unknown creditors, the court must now determine what form of notice Placid was required to give the Post-Confirmation Tort Claimants to satisfy due process requirements and ultimately discharge their claims. In general, for unknown creditors whose identities and claims are not reasonably ascertainable, and for creditors who hold only conceivable, conjectural, or speculative claims, constructive notice of the bar date by publication is sufficient. *Id.; Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d

---

[51] Much less, family members (derivatively) of employees.

Cir. 1995), *cert. denied*, 517 U.S. 1137 (1996) (toxic tort claimants' due process rights were met through publication notice where "it is well established that, in providing notice to unknown creditors, constructive notice of the bar claims date by publication satisfies the requirements of due process"). Here, Placid published notice of the bar date on three separate occasions in the *Wall Street Journal* and such publication notice was, under the circumstances and facts of this case, sufficient as to the Post-Confirmation Tort Claimants' claims.

The court recognizes that barring claims held by persons who may not have been aware of their claims on or before the bar date can be a harsh result for certain claimants. Because of this, in some instances, a future claims representative is appointed to act as a guardian for the unknown future claims. *See Chateaugay*, 2009 WL 367490, at *6. For example, where a debtor knows that it is facing significant tort liability due to asbestos exposure, it may be reasonable for the debtor to appoint a future claims representative.[52] *Id.* Here, based on the summary judgment

---

[52] The court would note that the safeguards that Congress enacted in section 524(g) of the Bankruptcy Code to address asbestos liability and notice concerns, with regard to claimants who may not be aware of their claims against a debtor, were not in existence during the Placid Bankruptcy Case, since section 524(g) of the Bankruptcy Code was not enacted until 1994. While some of the mechanisms embodied in section 524(g) of the Bankruptcy Code were starting to be used prior to the Placid Confirmation Order, Placid (it is undisputed) had never been subjected to asbestos claims, so there would have been no reason

evidence, the court does not believe, as a matter of law, that it would have been reasonable for Placid to appoint a future claims representative in its case.  First, there had been no prepetition asbestos incidents or events that would even have suggested an awareness by Placid of a potential class of asbestos claimants. Second, it is **_highly significant_** that the State Court Petition is only one of nine total asbestos-related personal injury claims that has ever been filed against Placid (not including the 31 Placid Refining Company facility post-confirmation claims).  For a company as large as Placid, this court does not believe that nine post-confirmation asbestos-related lawsuits (with the first being brought approximately 11 years after the Confirmation Order was entered) is significant enough to show that Placid was even remotely aware of a future asbestos problem.[53]  Moreover, even when one looks at the nature of the nine lawsuits that were filed, only four, including this Adversary Proceeding, appear to relate to asbestos exposure near or at the Blacklake Facility.[54]

_____

for it to consider the type of mechanisms embodied in section 524(g) of the Bankruptcy Code.

[53] In _Chateaugay_, the bankruptcy court found that the filing of 13 post-confirmation asbestos lawsuits was not significant enough to show that the debtor should have appointed a future claims representative.  _Chateaugay_, 2009 WL 367490, at *6.

[54] The court does not find the additional 31 cases that were described in the Revised Agreement as relevant in assessing whether Placid was somehow aware of potential future tort liability and whether the appointment of a future claims

Thus, it would not have been reasonable to appoint a future
claims representative, and the publication notice was sufficient
in discharging the Post-Confirmation Tort Claimants' claims.  Due
process requires reasonable notice under the circumstances.
Here, Placid had hundreds of employees worldwide and only nine
asbestos claims have ever been asserted against it relating to
its facilities.  Since no asbestos claims were ever asserted
against it pre-petition, sending actual notice to employees and
their families would not have been reasonable.  Moreover, a
future claims representative would not have been a reasonable or
practical tool—when again, only nine asbestos claims had been
asserted and Placid was an oil company—not an asbestos
manufacturer or distributor or other entity that had reason to
expect mass tort claims in the future.  The law does not require
unreasonable acts in the name of due process.  *Tulsa Prof'l*

representative would be reasonable under the circumstances.  Not
only do all of these lawsuits relate to a non-Placid owned
refinery in Port Allen, but Placid Refinery Company (the entity
who owned a percentage of the entity operating the refinery and
was a wholly-owned subsidiary of Placid), was not a debtor in the
Bankruptcy Case and was a separate corporation.  Thus, it would
not have been reasonable for Placid to consider potential future
tort liability when it came to Placid Refinery Company because it
would not be reasonable to establish a trust for the benefit of
future creditors of a non-debtor entity, especially in light of
the fact that no asbestos claims had ever even been filed against
either it or this non-debtor entity prior to Confirmation.  It is
also noteworthy that Placid has never been found liable in any of
the Placid Refining Company asbestos cases and has never paid any
money to settle such cases.

*Collection Servs. v. Pope*, 485 U.S. 478, 490 (1988).

## IV. CONCLUSION

Bankruptcy courts frequently struggle with the conflicting policy demands that exist between a debtor and its creditors. Life and our laws are not perfect—and the bankruptcy system is no exception.  On one side of the coin is the bankruptcy policy goal of providing debtors with fresh starts and resolving claims arising from their pre-bankruptcy conduct.  Relatedly, there is also the strong policy concern of preserving the finality of orders.  On the other side of the coin are the due process rights of potential creditors who may have been damaged by a debtor's pre-petition conduct, but who may have been unaware of the harm or potential harm.  Here, this court follows the majority of cases in the asbestos-bankruptcy context (and what it perceives to be the Fifth Circuit "pre-petition relationship" standard) and finds that prepetition, dischargeable claims existed *vis-a-vis* the Post-Confirmation Tort Claimants and Placid.  Further, based upon the facts and circumstances of this particular case, the court ultimately concludes that due process as to the Post-Confirmation Tort Claimants was met (*i.e.,* publication notice to these "unknown creditors" was sufficient—with no need for actual notice to them or a trust mechanism or future claim representative), and, thus, Placid is entitled to keep intact the

fresh start of its decades-old discharge. Accordingly, it is

**ORDERED** that Placid's MSJ is ***granted***; it is further

**ORDERED** that the Post-Confirmation Tort Claimants' MSJ is ***denied***; and it is further

**ORDERED** that counsel for Placid shall upload a separate form of Judgment that the Post-Confirmation Tort Claimants' Claims in the State Court Petition were discharged by the Confirmation Order and that the Post-Confirmation Tort Claimants are enjoined from pursuing the State Court Petition or any related claims in any court, tribunal, or administrative agency.

**###END OF MEMORANDUM OPINION AND ORDER###**